1      UNITED STATES DISTRICT COURT

2      EASTERN DISTRICT OF LOUISIANA

3    ******************************************************************

4    CATHERINE BROWN

5

6    VERSUS

7

8    MINYANGO TOKPAH, ET AL

9    ******************************************************************

CIVIL ACTION NO. 21-1844 "H"
NEW ORLEANS, LOUISIANA
DECEMBER 14, 2021, 10:00 A.M.

10

11      TRANSCRIPT OF PRELIMINARY INJUNCTION HEARING
        HEARD BEFORE THE HONORABLE JANE TRICHE MILAZZO
12             UNITED STATES DISTRICT JUDGE

13

14   APPEARANCES:

15

16   FOR THE PLAINTIFF:    LAW OFFICES OF DOMINIC N. VARRECCHIO
                           BY:  DOMINIC N. VARRECCHIO, ESQUIRE
17                         P. O. BOX 56547
                           NEW ORLEANS, LA  70156
18

19

20   OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                 CERTIFIED REALTIME REPORTER
21                               REGISTERED MERIT REPORTER
                                 500 POYDRAS STREET, ROOM B-275
22                               NEW ORLEANS, LA  70130
                                 (504) 589-7779
23                               Cathy_Pepper@laed.uscourts.gov

24

25   PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.  TRANSCRIPT
     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

***OFFICIAL TRANSCRIPT***

Timestamps in left margin:
09:46:47 (line 5)
09:46:21
09:46:21 (line 6)
09:45:17
09:45:17 (line 7)
09:45:17

**P-R-O-C-E-E-D-I-N-G-S**

M O R N I N G   S E S S I O N

DECEMBER 14, 2021

(COURT CALLED TO ORDER)


THE DEPUTY CLERK:  All rise.  This is Civil Action 21-1844, Catherine Brown versus Minyango Tokpah, et al.

Counsel, please make your appearance for the record.

MR. VARRECCHIO:  Dominic Varrecchio for -- may I take this off?

THE COURT:  Yes, you may.

MR. VARRECCHIO:  Dominic Varrecchio for the plaintiff, Catherine Brown.

THE COURT:  Okay.  Mr. Varrecchio, before we begin, I've looked at it, and this is in a bit of a peculiar posture because we have -- we can proceed against, as I see it, three people who have been served, not the others because we don't have any confirmation of service and they have defaulted.

But I did receive correspondence just this morning from Ms. Stewart --

MR. VARRECCHIO:  Yes.

THE COURT:  -- with a video that I quickly looked at but did not listen, and she said she's requesting a continuance

*OFFICIAL TRANSCRIPT*

because she is planning to get counsel.  This is in a *pro se*
capacity.  I'm not inclined to proceed against Ms. Stewart
today, so it would simply be against Wright, Miller, and
Brunson.

          MR. VARRECCHIO:  Can I give you an outline of where I
am?

          THE COURT:  Yes.  Why don't you come up here.  It's
much easier for me.  Yes, sir.

          MR. VARRECCHIO:  We have six defendants plus Google who
we have attempted to serve with this.  Google, really, just to
try to get them to refrain from posting what we say are
threatening and slanderous items.

               The six we've tried to get, two were returned is
not -- is not able to be served.  That was Topkah or Tokpah and
Shakim Harris.

               Tanisha Wright was the first person served.  She
called me, left a pretty nasty message claiming that she was
not the person that was involved in the lawsuit, but then
later, as my client will attest today, she's posted other items
saying she was served that connects her to the lawsuit, so
there is a little tension there.

               In addition, Attorney Joe McMahon, a local
attorney who practices in federal court I'm somewhat acquainted
with, contacted me on behalf of Tanisha Wright with an interest
in perhaps getting involved in the case.  This is, perhaps,

**OFFICIAL TRANSCRIPT**

10:22:47 1 three or four weeks ago.

10:22:48 2 We had a long conversation about it. He's never

10:22:52 3 enrolled and never contacted me since. I called him one time.

10:22:55 4 He didn't call me back, so I'm assuming he's not going to

10:23:00 5 engage in the file, given the three or four weeks that have

10:23:02 6 gone by.

10:23:03 7 Jonte Miller was the first one served. I have a

10:23:05 8 green card signed, returned from him, but the post office

10:23:09 9 website says he was not served and it was returned. So, I have

10:23:15 10 a green card that was mailed back to me.

10:23:17 11 THE COURT: With his signature on it?

10:23:20 12 MR. VARRECCHIO: With a signature that's not legible,

10:23:22 13 but nonetheless, the post office processed it and sent it back

10:23:27 14 to me. I've heard nothing from him. I've heard nothing from

10:23:31 15 Mr. Tokpah, and I've heard nothing from Harris.

10:23:33 16 Theresa Brunson and was served and I have a

10:23:37 17 signature; again, not her signature but a signature for the

10:23:41 18 office it was served on.

10:23:43 19 Two days ago -- she was served, perhaps, three or

10:23:46 20 four weeks ago. I want to say November 17th. It's in my

10:23:49 21 return. She contacted me two days ago saying that -- and she's

10:23:53 22 an attorney, as I understand it -- that she heard about the

10:23:58 23 lawsuit, but she hasn't been served and that I need to direct

10:24:03 24 everything to her at her proper address, which she did not give

10:24:07 25 me, but she did give me two updated email addresses. So I sent

10:24:13  1   everything to her again, as included in my packet, that I sent

10:24:20  2   that to her via email the same day she contacted me, I want to

10:24:24  3   say two days ago.

10:24:25  4           Donald Murray I've heard nothing from and these

10:24:31  5   other aliases and these other people.

10:24:33  6           I will say that the Good Guys are actually an

10:24:38  7   L.L.C., and I believe the agent is Brunson -- or who is the

10:24:45  8   agent again?

10:24:46  9       MS. BROWN:  Brunson.

10:24:47 10       MR. VARRECCHIO:  So we served Brunson and that would be

10:24:49 11   one of these alias or group defendants.  I did not file a

10:24:54 12   return on that one.  My apology.  I neglected to file a return

10:24:59 13   on the Good Guys, but it is the agent, Ms. Brunson, who is the

10:25:02 14   lawyer in this.

10:25:02 15       THE COURT:  She has been served?

10:25:07 16       MR. VARRECCHIO:  Yeah, Brunson was served.  I don't

10:25:09 17   have a return on the Good Guys and I apologize for that.

10:25:13 18   That's the L.L.C.  I'm going to have to update that.  I

10:25:17 19   apologize for that.

10:25:18 20           But nonetheless, what I'm really looking for

10:25:20 21   today is to try to get my client some peace and some kind of

10:25:23 22   order, even if it's just against the three that we're

10:25:26 23   proceeding against.

10:25:26 24       THE COURT:  We can't do it against anyone else because

10:25:30 25   of the rule.  It would just be against the people that I see

**OFFICIAL TRANSCRIPT**

10:25:34 1  appear to have been properly served and whose time has run for

10:25:38 2  appearance, which would be Wright, Miller, and Brunson.

10:25:44 3  MR. VARRECCHIO:  Okay.  I also want to add, just for

10:25:46 4  the record, our interest, really, is not to default anybody in

10:25:50 5  the principal lawsuit.  We're just, again, looking for some

10:25:54 6  type of order and peace, something that's going to give some

10:25:58 7  kind of relief to my client.

10:26:00 8  Perhaps, if the Court wants, we will have my

10:26:04 9  client take the stand and outline what she has been through and

10:26:07 10  some of the things and some of the reasons and motivations for

10:26:10 11  this, if the Court wants to do that.

10:26:12 12  THE COURT:  That may have to occur because I'm very

10:26:15 13  concerned about this case with First Amendment rights.  People

10:26:18 14  have a right to express themselves and sometimes in, perhaps,

10:26:24 15  what I might consider to be inappropriate behavior,

10:26:28 16  inappropriate comments, but, nonetheless, protected.  People

10:26:34 17  say very upsetting things.  So I'm concerned about where is the

10:26:41 18  line, Mr. Varrecchio.

10:26:44 19  MR. VARRECCHIO:  Well, I understand that people have a

10:26:47 20  right to be nasty.  People have a right to have horrible

10:26:50 21  opinions.  People have a right to have horrible sexual

10:26:54 22  opinions.

10:26:54 23  At this point, and I've spent a lot of time with

10:26:57 24  my client and explaining this to her, as upsetting as that

10:27:01 25  might be and how there might be a civil remedy for that later

**OFFICIAL TRANSCRIPT**

10:27:04 1   on in the defamation or the intentional infliction context,

10:27:10 2   right now I want to focus on the very narrow circumstance of

10:27:15 3   her feeling threatened and the evidence that she has and the

10:27:21 4   observations that she has and the broadcasts that have been

10:27:25 5   made involving her being threatened and about how these same

10:27:29 6   actors have threatened other people and have posted stalking

10:27:34 7   other people at their homes and businesses and have threatened

10:27:38 8   other people's families and how that, in the next step of the

10:27:44 9   venom directed against her, she believes that these threats

10:27:48 10  will now encompass her.

10:27:53 11        Since we filed the lawsuit and since we've made

10:27:56 12  attempted service and contact and email contact with some

10:27:59 13  people, and I want to add there is about 13 emails, I believe,

10:28:02 14  in my Rule 65 certificate, not one has bounced back ever.

10:28:09 15  Every one has gone out and have not bounced back as a bad

10:28:14 16  address or not -- no response where this is not me.  You have

10:28:17 17  the wrong number.

10:28:19 18        I'm just focused on the whole reason we're here

10:28:22 19  and the whole reason we're taking the Court's time is to try to

10:28:26 20  buy her some peace from what we believe are threats to her.

10:28:30 21        THE COURT:  Has an application been made with the

10:28:33 22  Sheriff's Office or some sort of protective order because I

10:28:45 23  have been physically threatened?  Have people gone to her home

10:28:47 24  and that sort of thing that would be encompassed in a

10:28:52 25  protective order?

MR. VARRECCHIO:  I'll address this with my client.
She's telling that me she's made attempts.  She is a full-time
resident -- not full-time.  She was a permanent resident,
domicile of Delaware for the longest time.

She has family here.  She's in Louisiana three,
four, five months a year.  She's now relocated to Louisiana
full time.  She says that she approached Delaware law
enforcement and federal law enforcement, and it was
unsuccessful, the details for which I think she could better
explain to you.

THE COURT:  Okay.

MR. VARRECCHIO:  I absolutely -- far be it from me to
say anything for what the Court should do.  If the Court wants
to ask my client direct questions, please do that.

THE COURT:  Okay.  All right.  Now, we need to
understand that this is going to be limited to those three
people that have been served, that sufficient time has run, and
I've heard nothing from them.

MR. VARRECCHIO:  I understand that.  However, are we
able to let her testify to whoever has threatened her in the
recent months, certainly in the interim since filing the suit
whether they have been served or not that these people
threatened her, and to give you the largest context of what's
going on?

THE COURT:  I'll listen to it and perhaps just have to

| | |
|---|---|
| 10:30:10 1 | ferret out what I can what any relief, if I deem appropriate |
| 10:30:14 2 | and legal, what I could grant would only be against those three |
| 10:30:20 3 | people. |
| 10:30:21 4 | MR. VARRECCHIO: I understand. |
| 10:30:21 5 | THE COURT: Okay. |
| 10:30:21 6 | MR. VARRECCHIO: And is it at all possible that the |
| 10:30:25 7 | Court could direct you to Google, same company, to not allow |
| 10:30:30 8 | continued threats from those three? |
| 10:30:32 9 | THE COURT: No. The Court is not going to do -- let's |
| 10:30:34 10 | just proceed. Thank you. |
| 10:30:36 11 | MR. VARRECCHIO: Should I call my client up? |
| 10:30:38 12 | Catherine. |
| 10:30:44 13 | MS. BROWN: (Crying.) I don't know what I'm to do. |
| 10:30:45 14 | MR. VARRECCHIO: Let's take the stand and go A, B, C, |
| 10:30:48 15 | and D and let the Judge -- |
| 10:30:49 16 | THE WITNESS: (Speaking simultaneously) It's |
| 10:30:51 17 | ridiculous. |
| 10:30:52 18 | MR. VARRECCHIO: No, it's not. She'll hear what's |
| 10:30:53 19 | going on. Let's do what you need to do, and let's get what we |
| 10:30:59 20 | need to get, okay? |
| 21 | THE DEPUTY CLERK: Would you please raise your right |
| 22 | hand. Do you solemnly swear that the testimony which you are |
| 23 | about to give will be the truth, the whole truth and nothing |
| 24 | but the truth, so help you God? |
| 25 | THE WITNESS: Yes. |

*OFFICIAL TRANSCRIPT*

**CATHERINE BROWN**

was called as a witness and, after being first duly sworn by
the Clerk, was examined and testified on her oath as follows:

EXAMINATION BY MR. VARRECCHIO:

Q.   Catherine, state your name.

A.   Catherine Brown.

Q.   Where do you live?

A.   I currently work for Amazon.

Q.   You work for Amazon?

A.   Yes, I do.  You asked where work?

Q.   You live.

A.   I live in -- do I have to say this on the record --

Q.   (Speaking simultaneously) What parish?  What parish.  What
parish and state that you live in?

A.   Acadiana.  Louisiana.

Q.   Okay.  You can tell the Court.  Nobody is going to --

         THE COURT:  Is that in the Eastern District?

         MR. VARRECCHIO:  Huh?

         THE COURT:  Acadiana is not in the Eastern District.

         MR. VARRECCHIO:  This is where she recently relocated
to.  I'm going to get into that.

         THE COURT:  Okay.

         THE WITNESS:  Yes.

EXAMINATION BY MR. VARRECCHIO:

Q.   Are you familiar with the petition that you filed in this

*OFFICIAL TRANSCRIPT*

10:32:02 1 lawsuit?

10:32:03 2 A.    Yes, I am.

10:32:03 3 Q.    And what was your -- very quickly what was your motivation

10:32:08 4 to filing your lawsuit?

10:32:09 5 A.    I was being stalked.  I was being sexual assaulted.  I was

10:32:13 6 being threatened.  My life was being threatened.  I was being

10:32:16 7 extorted for money.  I have gone to the sheriff.  I've gone to

10:32:19 8 the police.  I've gone everywhere.

10:32:21 9      This is a group of trolls, and they would call in to

10:32:24 10 the different places and give weird testimony, weird statements

10:32:28 11 against me.  Hence, I had -- didn't have sufficient evidence,

10:32:34 12 and I got an email from the police saying they didn't have

10:32:37 13 sufficient evidence or probable cause enough to obtain the

10:32:41 14 videos that they had deleted.  So he -- they suggested that I

10:32:45 15 take it to civil court and get a civil ruling against them and

10:32:48 16 then bring it back for criminal charges.

10:32:51 17 Q.    What state did this occur in?

10:32:53 18 A.    This occurred in Delaware because when Don Murray was

10:32:57 19 stalking me and threatening to kill me for money, I was in

10:33:01 20 Delaware at the time.

10:33:02 21 Q.    Okay.  At the time, did any of the observation -- let's

10:33:07 22 start over.

10:33:08 23      You said you were sexually threatened, and you

10:33:12 24 mentioned a list of things that happened to you.  Did any of

10:33:14 25 these things happen to you in New Orleans, Louisiana?

*OFFICIAL TRANSCRIPT*

A.    Most of them happened in New Orleans, Louisiana.  When I
was going back and forth from Delaware to New Orleans -- let me
backtrack.

          The reason why I went to Delaware is to start up a
nonprofit organization and to incorporate an IT firm.  I wanted
to be there.  Delaware is very easy to get incorporated, and
the laws are lax for corporations, and I want to start -- I had
dreams of starting a very large IT firm and consulting firm, as
well as a nonprofit organization, which is very successful.

          THE COURT:  Ma'am, what is your nonprofit?

          THE WITNESS:  The nonprofit is the Reginald --
Reginald Noble School of Methodologies -- Software
Methodologies.

          THE COURT:  What does it do?

          THE WITNESS:  We train incarcerated youth on texting
methodology, software texting methodology so that they will
have a skill set once they get out of incarceration.

          THE COURT:  So I was just trying to get some background
here.  So you left Louisiana to do that in Delaware; is that
correct?

          THE WITNESS:  Actually, I left Louisiana for more than
that.  I ended up going to Delaware for that.  I left Louisiana
because I'm an IT consultant -- IT consultant, and I do 1099
contracts, so I've been all over the United States.  I just
decided to --

                    *OFFICIAL TRANSCRIPT*

10:34:42 1    THE COURT:  When did you relocate in Delaware?

10:34:44 2    THE WITNESS:  When did I go to Delaware?

10:34:47 3    THE COURT:  When did you relocate to Delaware?

10:34:49 4    THE WITNESS:  I would say about five years ago.

10:34:53 5    THE COURT:  Okay.  But your family remained in

10:34:56 6 Louisiana?

10:34:57 7    THE WITNESS:  My entire family was in Louisiana.

10:34:59 8    THE COURT:  So as I appreciate it, you went back and

10:35:01 9 forth?

10:35:02 10    THE WITNESS:  Yes, ma'am.

10:35:03 11    THE COURT:  Okay.  When were you first -- when did you

10:35:08 12 first get -- and we're going to have to separate this because

10:35:12 13 you went through a lot.  When did you first be sexually

10:35:19 14 assaulted?  You're going to need to describe to me exactly what

10:35:25 15 occurred.

10:35:26 16    THE WITNESS:  It was during the month -- on or around

10:35:28 17 the month of, I would say, December 2020.

10:35:36 18    THE COURT:  What exactly occurred?

10:35:39 19    THE WITNESS:  TCTV began saying that I wanted his dick.

10:35:47 20 He began saying that I needed his dick and if I had his dick,

10:35:53 21 then I would not have a problem with the harassment and the

10:35:56 22 extortion that was going on.

10:35:59 23    THE COURT:  Was that in reference to -- and I need to

10:36:04 24 understand.  Was he saying that you needed this sexual

10:36:14 25 activity?

*OFFICIAL TRANSCRIPT*

10:36:14 1    THE WITNESS:  Yes.

10:36:16 2    THE COURT:  He said you needed his dick, or was it

10:36:16 3 saying that you needed to be a man?

10:36:18 4    THE WITNESS:  No.  I needed his sexual activity and

10:36:22 5 that he was going to give me some of his dick to calm me down.

10:36:26 6    THE COURT:  Okay.  All right.  Now, did he say that in

10:36:34 7 December 2020?

10:36:36 8    THE WITNESS:  He said that around December 2020, and he

10:36:40 9 continued to say that up until November 2021.

10:36:44 10    THE COURT:  Has he ever actually physically accosted

10:36:51 11 you in a sexual assault?  Did he try to rape you?  Did he try

10:36:58 12 to perform a sexual battery?  Did he ever grab you?

10:37:03 13    THE WITNESS:  He never grabbed me but he assaulted me

10:37:06 14 with the words.  He never grabbed me.

10:37:08 15    THE COURT:  So it was words?

10:37:09 16    THE WITNESS:  Yes.

10:37:10 17    THE COURT:  Were the words ever in person to you, or

10:37:13 18 was it always away talking about you to others?

10:37:19 19    THE WITNESS:  No, it was directed towards me in videos

10:37:22 20 on YouTube, directed directly toward me saying that I liked

10:37:26 21 white dick, and I needed a big black dick, and that's why I am

10:37:31 22 the way that I am.

10:37:32 23    THE COURT:  Okay.  Now, let me make sure that I

10:37:34 24 understand.  Were you in the studio at the time that he said

10:37:38 25 that, or was it just a broadcast and you listened?

*OFFICIAL TRANSCRIPT*

10:37:41 1    THE WITNESS:  It's broadcast.  Here is the thing:  They

10:37:43 2    don't have studios.

10:37:45 3    THE COURT:  Okay.  All right.  I'm trying to understand

10:37:47 4    if you were actually physically in his presence when he said

10:37:51 5    those things.

10:37:52 6    THE WITNESS:  No.  I was not physically in his

10:37:55 7    presence.

10:37:55 8    THE COURT:  Were you calling in?  As I appreciate it,

10:38:00 9    these are, I don't know, podcast kind of things.

10:38:07 10    THE WITNESS:  Yes, ma'am.

10:38:08 11    THE COURT:  Okay.  Were you calling in as a guest on

10:38:11 12    his podcast when he said those things to you?

10:38:13 13    THE WITNESS:  No.  Not at that particular time, but I

10:38:16 14    have been a guest and I have called in to his, but not at that

10:38:21 15    particular time.

10:38:21 16    THE COURT:  At the time that you called in, did he say

10:38:24 17    you needed, you know, the sexual activity with him to calm you

10:38:31 18    down?

10:38:32 19    THE WITNESS:  We were amicable at that time when I

10:38:34 20    called in.  Once I saw that he started making these comments

10:38:38 21    about me sexually, I certainly was not calling in to his panel

10:38:43 22    anymore.

10:38:44 23    THE COURT:  How many times did he say that you

10:38:47 24    basically needed -- I'm going to say that you needed to engage

10:38:51 25    in sexual activity.

**OFFICIAL TRANSCRIPT**

10:38:53 1    THE WITNESS:  I would say about 10 or 15 times.

10:38:56 2    THE COURT:  Okay.  Did anyone, as a result of that,

10:38:59 3 come to your home?  I'm trying to say this without sounding

10:39:07 4 crude.  Did anyone approach you and say, "I'm happy to

10:39:10 5 oblige."?

10:39:12 6    THE WITNESS:  Yes, ma'am.

10:39:13 7    THE COURT:  Okay.  Can you tell me about those

10:39:15 8 circumstances when someone confronted you and said, Look, I'm

10:39:19 9 here to take care of you; he told me you needed this.

10:39:22 10    THE WITNESS:  Don Murray said to me -- actually

10:39:27 11 Don Murray even made a podcast saying that said he and I laid

10:39:30 12 in a bed together, and we discussed things while I rubbed on

10:39:35 13 his big black dick.

10:39:35 14    THE COURT:  Okay.

10:39:36 15    THE WITNESS:  Now, Don Murray said that if I need some

10:39:39 16 dick, he would give it to me.

10:39:41 17    THE COURT:  Did he say that to you in person, or did he

10:39:43 18 say it on --

10:39:44 19    THE WITNESS:  No.

10:39:46 20    THE COURT:  -- on video?

10:39:46 21    THE WITNESS:  No, they make podcasts directing these

10:39:50 22 messages to you.  These are messages that are directed

10:39:52 23 specifically for you.  It's not like he's talking to an

10:39:55 24 audience and saying, Oh, you know, what, Catherine -- my

10:39:57 25 opinion is that Catherine Brown needs some dick.  They are not

10:40:00 1   saying that.  They are saying, Catherine Brown, what you need

10:40:03 2   is some dick.

10:40:04 3           THE COURT:  Okay.  I understand that.  Now, Mr. Murray,

10:40:10 4   you said, said on the podcast that I am happy to oblige --

10:40:16 5           THE WITNESS:  Yes.

10:40:17 6           THE COURT:  -- and I have given her mine?

10:40:19 7           THE WITNESS:  Yes.

10:40:19 8           THE COURT:  All right.  Did he ever tell you that in

10:40:21 9   person?  Did he ever visit your home or come to some place

10:40:26 10   where you were employed or working or living in person and

10:40:36 11   threaten you?

10:40:37 12           THE WITNESS:  Ma'am, those people are not coming to my

10:40:41 13   house.

10:40:41 14           THE COURT:  That's a question I just need to ask --

10:40:43 15           THE WITNESS:  (Speaking simultaneously) Right.

10:40:43 16           THE COURT:  -- podcast?

10:40:43 17           THE WITNESS:  I have a secured condo in Delaware, and

10:40:47 18   they would have to dial in, and I also have, like -- and my

10:40:52 19   place of employment, it's secured.  Are they stalking me and

10:40:56 20   driving by?  Yes.  I've seen them but they've never approached

10:41:00 21   me physically.  Yes.

10:41:02 22           THE COURT:  All right.  They have driven by your work

10:41:04 23   and your home?

10:41:05 24           THE WITNESS:  My home.

10:41:06 25           THE COURT:  Your home.  Have they ever stopped the car

10:41:09 1    and attempted entry?

10:41:12 2            THE WITNESS:  No, ma'am.  When I was coming out into

10:41:15 3    the parking lot, they were driving out of the parking lot.  I

10:41:18 4    was able to see the side of them.  I ran and I hid a little

10:41:21 5    bit, and I don't think he recognized me at the time.

10:41:24 6            THE COURT:  Okay.

10:41:26 7            THE WITNESS:  I was in a hat and a hoodie.

10:41:29 8            THE COURT:  Is that the complete area of sexual

10:41:37 9    assault?

10:41:37 10            THE WITNESS:  That's the complete area of sexual

10:41:40 11    assault, yes.

10:41:42 12            THE COURT:  Let's to go the next area, Mr. Varrecchio.

10:41:44 13    EXAMINATION BY MR. VARRECCHIO:

10:41:45 14    Q.    The number of defendants that we named in your lawsuit, I

10:41:50 15    want to get back to what you saw and when you saw it.  While

10:41:53 16    you were in Louisiana, your petition says -- and your petition

10:41:58 17    is based on your discussions that we had, numerous discussions

10:42:02 18    we had before we filed it -- said that the problems began at

10:42:06 19    least in October of 2020 --

10:42:08 20    A.    Yes.

10:42:09 21    Q.    -- and continued through to date?

10:42:11 22    A.    Yes.

10:42:11 23    Q.    I want to focus on what went on to make you feel

10:42:17 24    threatened.  You've said that there were postings by certain

10:42:22 25    defendants of them with guns?

                        *OFFICIAL TRANSCRIPT*

10:42:24 1   A.   Yes.

10:42:24 2   Q.   Of them going to other people's houses that they had

10:42:29 3   similar stalking or similar Internet harassment?

10:42:33 4   A.   Yes.

10:42:33 5   Q.   I want you to go slow because when the Judge says is this

10:42:37 6   the complete, that means that's the end.

10:42:40 7   A.   Yes.

10:42:40 8   Q.   Okay.  So let's go slow and let's work through them.  I'm

10:42:44 9   going to bring up some names, and I'm going to ask whether or

10:42:47 10  not these people did anything to threaten you --

10:42:51 11  A.   Okay.

10:42:52 12  Q.   -- and what did they do to threaten you?

10:42:55 13       Minyango Tokpah.  Did he do anything to threaten you

10:43:00 14  and how did he go about threatening you?

10:43:02 15  A.   Yes.  He did do things to threaten me.  He said that when

10:43:05 16  he comes to people's houses, he's coming to rape and to rob.

10:43:10 17  That is clearly said in a video.  Minyango said that he had my

10:43:17 18  address.  He said that he would be, quote, unquote, they call

10:43:20 19  exposing you come into my house, which is when I contacted you.

10:43:25 20       I felt that at that point I needed to do something.

10:43:29 21  Ignoring them, as seen in the past, that as you ignore them,

10:43:34 22  they progress.  They do it for content and video, for people to

10:43:38 23  look at their videos, excitement.

10:43:42 24       So I felt as though Minyango would come to my house

10:43:46 25  because Minyango filmed himself.  When he said he would expose

*OFFICIAL TRANSCRIPT*

another person, he filmed himself outside of that person's
house and said, "Hey, let's come and shoot it out."  He was
sending text messages to that person.  He filmed it on video of
himself sitting outside of someone's house to expose him, and
the guy was in the house with a shotgun saying, "Hey, come on.
Let's shoot it out."

          Well, I did not want that encounter with Minyango.  I
was not -- the reason why I came to you is because it seemed as
though I would have had to wait until I became -- until got
assaulted after seeing these people's pattern and their
history, I would have to wait until something happens to me.
And that's why I wanted -- that's why I came to you.  Because I
felt threatened.  I felt my life was threatened.  I felt that
this man was going to come to my house and do as he said.

          THE COURT:  Did you ever see him ride by your home?

          THE WITNESS:  No, ma'am.

          THE COURT:  Okay.  He said things in the podcast?

          THE WITNESS:  Yes, ma'am.

          THE COURT:  What exactly did he say in his podcast that
threatened you?

          THE WITNESS:  He said he was coming to my house.

          THE COURT:  Okay.  Now, how is that, the conduct of
Mr. Tokpah, related to the three served defendants,
Tanisha Wright, Jonte Miller, or Theresa Brunson?

          THE WITNESS:  They are all three friends, and they are

*OFFICIAL TRANSCRIPT*

10:45:15 1   in a collegiate together called the *Good Guys.*

10:45:16 2           THE COURT:  So is it a loosely based organization, or

10:45:19 3   is it some sort of a fraternity type --

10:45:23 4           THE WITNESS:  It's some type of fraternity.  They call

10:45:26 5   it a *brotherhood*, an Internet fraternity that they got together

10:45:31 6   as content creators.

10:45:33 7           THE COURT:  Now, has Tanisha Wright ever said anything

10:45:36 8   to you?

10:45:37 9           THE WITNESS:  Oh, yeah.  She said she would do a

10:45:39 10  drive-by and I'm in Delaware and she announced that.

10:45:42 11          THE COURT:  Now she is in Delaware?

10:45:45 12          THE WITNESS:  She is in Delaware.

10:45:47 13          THE COURT:  And she was going to do a drive-by?

10:45:49 14          THE WITNESS:  She said, "I should pull up on that

10:45:52 15  bitch."  She said, "As a matter of fact, I'm going to pull up

10:45:55 16  on that bitch.  She's in Delaware."

10:45:57 17          *Pull up* in African-American terms mean drive-by.

10:45:57 18  So when you're pulling up on somebody, you're going to do a

10:45:57 19  drive-by on them.

10:46:02 20          She said, "I'm going to slap the shit out of that

10:46:05 21  bitch.  I'll slap that bitch for filing a lawsuit against me."

10:46:10 22          I have it on video.

10:46:11 23          THE COURT:  Okay.  Prior to filing the lawsuit, though,

10:46:14 24  did she threaten you in any way?

10:46:16 25          THE WITNESS:  Oh, yes, she did.

10:46:17 1    THE COURT: All right. Specifically?

10:46:19 2    THE WITNESS: Specifically, she said, "I want to

10:46:24 3 confront" -- this is out of the clear blue sky -- "that bitch

10:46:29 4 Catherine Brown." Because I just gotten -- let me backtrack.

10:46:33 5 I had just gotten on a panel to clarify with -- the rumors that

10:46:38 6 they were saying to make them attack me.

10:46:40 7    THE COURT: What precipitated this attack? How do you

10:46:44 8 know these people?

10:46:46 9    THE WITNESS: I -- I -- I expressed a difference of

10:46:49 10 opinion online, and the difference of opinion was in support of

10:46:53 11 someone that they do not support, and ever since then I've been

10:47:00 12 attacked.

10:47:02 13    THE COURT: Okay. So you posted a comment?

10:47:03 14    THE WITNESS: I got on a panel and spoke of a comment,

10:47:06 15 and my simple opinion was this guy is a bad businessman, but he

10:47:12 16 it's not scamming. Let me show you how. And in the process, I

10:47:17 17 thought I could help them, as they are African-Americans,

10:47:20 18 establish businesses and let learn business processes -- what

10:47:24 19 business process are and then what she did wrong to make it

10:47:29 20 looks like he's a scammer, but he's not a scammer. He's just a

10:47:33 21 really bad businessman, and they began to attack me after that.

10:47:36 22    THE COURT: Prior to filing this lawsuit, how many

10:47:39 23 times did Ms. Wright say she was going to pull up on that

10:47:43 24 bitch?

10:47:45 25    THE WITNESS: I would say three times. She did it

*OFFICIAL TRANSCRIPT*

10:47:46 1  three times.

10:47:48 2      THE COURT:  Did she ever drive by your house?

10:47:52 3      THE WITNESS:  I have no idea whether or not they were

10:47:54 4  stalking me or not.

10:47:55 5      THE COURT:  Do you know?  Have you seen her at your

10:47:59 6  home?

10:48:00 7      THE WITNESS:  I have not seen her at my house.

10:48:03 8      THE COURT:  Has --

10:48:03 9      THE WITNESS:  I --

10:48:06 10     THE COURT:  Just let me finish.

10:48:07 11          Has the threat been limited to her podcast, that

10:48:13 12 sort of thing, or has she called you?  Has she sent other

10:48:16 13 people to tell you, "I'm on my way," that sort of thing?  Has

10:48:19 14 it been limited to the podcast, or is it something in addition

10:48:23 15 to that?

10:48:24 16     THE WITNESS:  Here is this thing that's concerning to

10:48:28 17 me:  The fact that I have not seen them does not mean that they

10:48:32 18 are not stalking me.  Here is why:  They know quite a bit about

10:48:36 19 me.

10:48:37 20          The next thing is:  Don has said in a video about

10:48:40 21 two or three days ago that he loves to see the threats of his

10:48:46 22 targets in his eyes while he sits back and watch their moves

10:48:51 23 like a mouse.  They are running around afraid of him, and one

10:48:54 24 day he's going to stomp their tail and crush them.

10:49:00 25     THE COURT:  I understand that.  I can't tell if there

10:49:04 1    is somebody outside with a bazooka waiting for me.  I can't

10:49:08 2    tell.  But you have the burden here.  Do you have any evidence

10:49:11 3    that they have been to your home, or is the evidence that you

10:49:19 4    know limited to words said in a podcast?

10:49:21 5         THE WITNESS:  I don't have any evidence other than the

10:49:25 6    time I saw them drive by.  I don't have any evidence of that.

10:49:29 7    I've been hiding out.  I've been hiding and I've just been

10:49:34 8    stuck in my house away from those people.  So if they are

10:49:39 9    outside, I have no idea.  They feel that they have a right to

10:49:44 10   harass, they have a right to stalk me, and I can do nothing

10:49:48 11   about it.

10:49:49 12        You just don't know how that makes me feel

10:49:51 13   because right now, I'm feeling like I have absolutely no

10:49:55 14   recourse.  I'm going to have to wait until one of them finally

10:50:00 15   kills me.

10:50:00 16        THE COURT:  Well, I'm just trying to find out what the

10:50:02 17   facts are, ma'am.

10:50:03 18        What about Mr. Miller?  Has he directly

10:50:08 19   threatened you?

10:50:09 20        THE WITNESS:  Who?

10:50:10 21        THE COURT:  Miller.  Jonte Miller.

10:50:12 22        THE WITNESS:  Jonte Miller is what's called an

10:50:13 23   *instigator* online.  He's the one that keeps up we need to -- we

10:50:19 24   need to get on Catherine Brown.  He's the one that keeps the

10:50:23 25   instigating, and he keeps the harassment going.  That's all he

has done was instigated.  He's incited violence against me or

volatile remarks toward -- against me and hatred against me.

THE COURT:  Now, what about Ms. Brunson?

THE WITNESS:  Who?

THE COURT:  Ms. Theresa Brunson.

THE WITNESS:  Ms. Brunson.  When I was talking to the

police, Theresa Brunson is -- TCTV -- TCTV is the main

character in this.  She is -- was an attorney and she sent a

letter to me, a cease-and-desist letter to me telling me to

stop communicating with the police.  She actually had a phone

call with me telling me to stop communicating with the police

during that time or they would take legal action against me,

which I knew that that could not happen.  It was just the

intimidation.  She was trying to intimidate me for going to the

police on TCTV.

THE COURT:  Did she threaten you physically?

THE WITNESS:  She did not threaten me physically.  She

just threatened to take legal action on me if I continued to go

to the police, which is the same thing -- what's her name --

Tanisha Wright did.  She threatened me physically if I

continued to go to the police.  And she is in Delaware.

THE COURT:  Has anyone been here in Louisiana?

THE WITNESS:  I have -- I don't know whether or not

they are people because these people are hiding behind masks

on -- right now I didn't even park by the courthouse because I

10:52:02 1  didn't know if they had someone following me.

10:52:04 2     They have trolls whose names are *Who Dat*, and

10:52:07 3  they have trolls whose names are *504 Westbank*, so they do have

10:52:11 4  trolls in New Orleans.  I have been hiding out when I come to

10:52:14 5  New Orleans as well, and hiding out my nieces and nephews

10:52:17 6  because they attack children as well.

10:52:20 7     MR. VARRECCHIO:  Could I ask her just a few questions?

10:52:24 8     THE COURT:  Please.

10:52:24 9  EXAMINATION BY MR. VARRECCHIO:

10:52:25 10  Q.    Did you -- do you believe that most of these defendants or

10:52:29 11  all of these defendants are interconnected or interrelated?

10:52:32 12  A.    Yeah, they are.

10:52:33 13  Q.    How are they interconnected or interrelated?

10:52:36 14  A.    They are interconnected because they are an Internet

10:52:39 15  fraternity, as I said, which is not a legal fraternity.  It's

10:52:42 16  just a fraternal order that they have created on the Internet.

10:52:45 17  And they are trolls.  They have trolls that are assigned to

10:52:48 18  them, and they have proof of that for the lawsuit, trolls that

10:52:51 19  are assigned to them to carry out their -- what they say.  And

10:52:55 20  they also get paid to do it.  They admitted that as well.

10:52:59 21  Q.    What is your basis for believing people are paid to do

10:53:04 22  things?  Why do you believe people are paid to do things --

10:53:06 23  A.    (Speaking simultaneously) Because they've said it.

10:53:08 24  They've said that they get paid to do that.  Poetik Flakko --

10:53:26 25  Minyango -- his screen name is Poetic Flakko -- Minyango said a

10:53:28 1   couple of times, "I'm going to make some money today.  I'm

10:53:31 2   going to troll this website."

10:53:33 3         TCTV has said, "We get paid for this, and the cash

10:53:38 4   apps are drying up."

10:53:41 5         Don Murray has said, "If you want me to attack

10:53:44 6   Catherine Brown, my cash app must get hit," and the cash app

10:53:50 7   got hit and he began attacking me.

10:53:52 8   Q.  Okay.  You said you believe these people are

10:53:57 9   interconnected.  How often are there postings not just that

10:54:02 10   involve you?  I'm trying to give the judge a flavor.  Is this

10:54:06 11   once a month they go online?  Once every three months?  Every

10:54:09 12   week?  Every day?

10:54:09 13   A.  Every day.

10:54:10 14   Q.  Every day?

10:54:11 15   A.  Every day.  Sometimes two or three times day.

10:54:14 16   Q.  What is their venue?

10:54:16 17   A.  YouTube and Discord.

10:54:19 18   Q.  Do you have any idea what the viewership is of some of

10:54:22 19   these people's --

10:54:23 20   A.  Sometimes thousands.  So I have no idea who is coming at

10:54:26 21   me.

10:54:26 22   Q.  Do you believe there are people at 504 based on -- how do

10:54:30 23   you believe they are connected and related to this?  Because of

10:54:33 24   comments or because of their own posts?  How do you believe

10:54:36 25   they are connected?

A.   Oh, because you could read their comments.  You're looking at their comments, and they are talking about New Orleans and east bank or Westbank and, you know, what the weather is and all of this other stuff, so...

Q.   This group of people who we've named as defendants and the A-list groups that we're trying to identify, did you ever see any video in the last year of them physically stalking other people's houses?

A.   Yes.  Many times.

Q.   And who posted it?  Did they post it?

A.   All of them.  They share the videos in that fraternity, so one will comment on it, and then they take the video and they all start commenting on it and laughing at it and thinking it funny.

I've seen them go into people's house to read their meters at four o'clock in the morning.  I've seen them go, as Don said, pull up on people, and people run in their house and call the police.

Q.   When you say you've seen it, you've not been an eyewitness in the live moment but you've seen it on film?

A.   On the video.

Q.   Okay.  And it was posted on YouTube?

A.   Yes.

Q.   Which is the -- a Google channel?

A.   The primary, yes, the primary -- the primary.

*OFFICIAL TRANSCRIPT*

10:55:54 1    Q.   I want to just mention, the Judge asked you a few

10:55:58 2    questions about Tanisha Wright.  You put in your petition

10:55:58 3    during your interviews with me, and I included them in the

10:56:02 4    petition, that Tanisha Wright had made false claims online

10:56:07 5    claiming to be you, impersonating you by creating conflicts or

10:56:15 6    disagreements with other people; is that true?

10:56:16 7    A.   Yes.  She has not only done that, she's also said that I

10:56:22 8    was Andrea Stewart.  Andrea Stewart posts a lot of hate

10:56:26 9    messages, a lot of hate, you know, things about people and even

10:56:32 10   calling black women *chicken hands* and *turkey heads* and things

10:56:32 11   like that, talking about their hair.

10:56:35 12          And she said that I was Andrea Stewart, because

10:56:39 13   Andrea Stewart had never shown her face.  "It's Catherine Brown

10:56:42 14   who is doing this."  All of this is just to keep up the

10:56:45 15   animosity toward me so that people wouldn't mind -- wouldn't

10:56:49 16   care about attacking me.  And yes, she did.

10:56:54 17          Spotem Shotem also impersonated me.  He has an

10:56:57 18   account right now named *Ms. Catherine Brown*, and he's telling

10:57:02 19   women that they need big black dicks, using that name.

10:57:06 20   Q.   Was there any racial component to the threats made against

10:57:11 21   you when you went to the police in Delaware about the original

10:57:15 22   threats against you?

10:57:15 23   A.   Yes.  Of course.

10:57:16 24   Q.   Can you explain, go slow, and explain why this might --

10:57:22 25   gives you heightened concerned about what's going on.

**OFFICIAL TRANSCRIPT**

| | | |
|---|---|---|
| 10:57:24 | 1 | A.   Well, because of the fact that you have to understand that |
| 10:57:28 | 2 | I did not meet these people with animosity.  I met these people |
| 10:57:33 | 3 | trying -- I met them trying to help them and clarify some |
| 10:57:37 | 4 | things, you know, to them. |
| 10:57:40 | 5 | Q.   Help them how?  Excuse me.  Help them how? |
| 10:57:41 | 6 | A.   Yes, to help them out. |
| 10:57:43 | 7 | Q.   No.  How? |
| 10:57:45 | 8 | A.   By a business -- they wanted to start businesses.  I could |
| 10:57:50 | 9 | direct them to right, you know, to the right small business |
| 10:57:53 | 10 | association.  Because they made me feel as though they were a |
| 10:57:56 | 11 | group of people who were interested in entrepreneurship, and I |
| 10:58:01 | 12 | thought I could help them.  And so I said a lot of things, I |
| 10:58:04 | 13 | guess, about myself that they -- that they grasped onto and |
| 10:58:10 | 14 | later used it against me. |
| 10:58:11 | 15 | So -- and one of the things that I told them is that, |
| 10:58:14 | 16 | you know -- you know, one of the things I told them, they were |
| 10:58:20 | 17 | saying that, you know -- you know, that, hey, look, we try to |
| 10:58:27 | 18 | do this, we try to do that, and we can't do it because we're |
| 10:58:30 | 19 | black.  And I'm like, no, you can do it.  I'm 55 percent black. |
| 10:58:35 | 20 | So they knew that the other part was not black.  So they |
| 10:58:38 | 21 | flipped it and said that I'm not sufficiently African-American |
| 10:58:43 | 22 | to say some of the things that I said or to go to the police. |
| 10:58:47 | 23 | They called me a *Karen*. |
| 10:58:49 | 24 | Q.   Did you get any broadcast or Internet communications from |
| 10:58:53 | 25 | anybody complaining about or threatening you for going to the |

*OFFICIAL TRANSCRIPT*

10:58:58  1   police?

10:58:58  2   A.    Yes.

10:58:59  3   Q.    Who did you get them from and what was the sum and

10:59:04  4   substance of that threat?

10:59:05  5   A.    Tanisha Wright.  She wants to kick my ass, and like I

10:59:09  6   said, she called me a *Karen*, which means a white woman who goes

10:59:13  7   to the police on black men.

10:59:16  8           Andrea Stewart said that I filed false police reports

10:59:19  9   on black men.  That could get me killed.

10:59:22 10   Q.    Why do you believe that?

10:59:22 11   A.    Why did I believe that?

10:59:25 12   Q.    I want you to explain to the Judge.  This is why we're

10:59:28 13   here.  We're here to understand.  We're here because you were

10:59:32 14   threatened, not because you were called nasty names.  I want to

10:59:35 15   know what about that made you feel threatened.

10:59:38 16   A.    Well, according to Tanisha Price (verbatim), when she made

10:59:43 17   her explanation, there was a lot of animosity that the cops

10:59:45 18   have toward black men, and I am filing false police reports on

10:59:50 19   black men, and I'm trying to get black men injured by the

10:59:54 20   police, and that makes me a target right there for the

10:59:57 21   thousands of people who watch their videos and were heard

11:00:02 22   saying she'll kick my ass for going to the police for reprieve.

11:00:07 23           Andrea Stewart did the same thing.  Andrea Stewart

11:00:09 24   said that I filed -- she even sent an email to the police

11:00:12 25   saying that I filed false police reports on black men, which is

**OFFICIAL TRANSCRIPT**

11:00:17 1  not true.

11:00:17 2  Q.   Did anybody ever post anything on any Internet channel or

11:00:23 3  message where they said that any -- a black woman making

11:00:27 4  complaints against black men need be punished or have

11:00:32 5  retribution?

11:00:33 6  A.   Yes.

11:00:34 7  Q.   Who?

11:00:37 8  A.   Tanisha Wright did.  Tanisha Wright said that I needed my

11:00:39 9  ass kicked.  TCTV said that filing black -- filing for -- me

11:00:46 10 filing false police reports on black men, I shouldn't be on

11:00:52 11 this earth.

11:00:53 12      THE COURT:  Well -- who is TCTV?  I mean, how does TCTV

11:00:57 13 talk?

11:00:58 14      THE WITNESS:  TCTV is the Number 1 person.  He started

11:01:02 15 all of this, and he is the one who -- he is the corporate

11:01:09 16 behind all of this.  He is the one who (speaking

11:01:10 17 simultaneously) --

11:01:10 18      THE COURT:  What's his name?

11:01:12 19      THE WITNESS:  That's his name.

11:01:14 20      THE COURT:  That's his name?

11:01:14 21      THE WITNESS:  The name of his channel is TCTV.

11:01:17 22      THE COURT:  What's his name?

11:01:18 23      THE WITNESS:  We don't know.  Google has said they will

11:01:23 24 give us the names of all of the anonymous people.  They sent an

11:01:27 25 email saying that.

                    *OFFICIAL TRANSCRIPT*

11:01:28  1      MR. VARRECCHIO:  Once we file a subpoena.  We are going

11:01:29  2  to have to subpoena them through this litigation.

11:01:31  3      THE COURT:  Okay.

11:01:31  4      THE WITNESS:  He is represented by Theresa Brunson, and

11:01:34  5  in the cease-and-desist letter, Theresa Brunson referred to him

11:01:40  6  as *TCTV*.

11:01:46  7  EXAMINATION BY MR. VARRECCHIO:

11:01:47  8  Q.    Did Theresa Brunson ever mention to you verbally or

11:01:50  9  through her letters that you should not be making complaints

11:01:52 10  against black men?

11:01:53 11  A.    Yes, she did.

11:01:54 12  Q.    Did she specifically use the term *black men*?

11:01:57 13  A.    Yes, she did.

11:01:58 14  Q.    In what context -- do you recall the context of the

11:02:00 15  message?

11:02:01 16  A.    She said that we're black and we don't want anybody black

11:02:06 17  going to jail over any of this.  And she said that I should

11:02:13 18  fall back and let the chips fall as they may and just don't

11:02:17 19  communicate with him anymore, TCTV anymore, and he won't

11:02:21 20  communicate with me anymore, and I said that I have not been

11:02:25 21  communicating with him and --

11:02:27 22      THE COURT:  Isn't that the purpose?  That's what you're

11:02:30 23  asking me?  If he won't communicate, I won't communicate; so,

11:02:34 24  what's the problem with that?  It looks like you've already

11:02:38 25  worked it out.

11:02:39 1         THE WITNESS:  There is no problem with that, with her

11:02:42 2  saying that.  I was in agreeance with that.  The problem came

11:02:46 3  when TCTV continued to communicate, and I stopped communicating

11:02:50 4  completely with him, not even going out of town, not even going

11:02:55 5  to their channels on YouTube, and he and Tanisha Wright,

11:02:58 6  Andrea Stewart, and the rest of them continued to harass me and

11:03:03 7  continued to incite people against me.

11:03:04 8         THE COURT:  Has anyone outside of the people that are

11:03:05 9  talking on the podcast -- have you heard any of this outside of

11:03:16 10  those stations on tuning in to that podcast?

11:03:20 11         THE WITNESS:  Say that again.

11:03:20 12         THE COURT:  If you didn't turn on the station, if you

11:03:23 13  didn't listen to the podcast, would you know any of this?

11:03:25 14         THE WITNESS:  Yes, I would.

11:03:27 15         THE COURT:  How?

11:03:27 16         THE WITNESS:  Okay.  So I -- the person,

11:03:33 17  Dr. Murray Johnson, who I was supporting -- someone who I

11:03:36 18  supported contacted me, and they were offering me support,

11:03:40 19  like, you know, just support --

11:03:40 20         THE COURT:  Okay.  So --

11:03:41 21         THE WITNESS:  And I'm about to -- please, let me or

11:03:43 22  you're not going to understand what happened.

11:03:45 23           So, they invited me to an event, a gathering, a

11:03:50 24  dinner in Newark, New Jersey, and I said, "Oh, sure."  Newark,

11:03:55 25  New Jersey.  I was in Delaware at the time.  It's just an hour,

11:03:59  1   an hour and a half ride up.  And I said, "Oh, sure," and they

11:04:02  2   begin to attack me with everything that was said on YouTube.  A

11:04:09  3   6'4" man began to attack me with every single word that had

11:04:13  4   been said on YouTube.  I got in my car and left.

11:04:17  5            Another time --

11:04:19  6            THE COURT:  So what do you mean he attacked you?

11:04:22  7            THE WITNESS:  He said, "You call the cops on black

11:04:25  8   men."

11:04:26  9            THE COURT:  Did he touch you?

11:04:28 10            THE WITNESS:  Yes.  He did not touch me.  He

11:04:30 11   accidentally spilled a drink on me.  But he did not touch me.

11:04:36 12   He got in my face.  But he did not touch me.  I cannot say

11:04:41 13   that.  But I will say that he accidentally spilled a drink on

11:04:46 14   me and that's enough.

11:04:47 15            THE COURT:  Did anybody else touch you?

11:04:53 16            THE WITNESS:  Nobody else touched me.

11:04:55 17            THE COURT:  Okay.  So this man confronted you saying,

11:04:57 18   "You called the police on black men."?

11:05:01 19            THE WITNESS:  Yes.

11:05:02 20            THE COURT:  I'm sure it was aggressive.

11:05:05 21            THE WITNESS:  Pardon me?

11:05:05 22            THE COURT:  Was he aggressive?

11:05:07 23            THE WITNESS:  Yes, he was aggressive.

11:05:09 24            THE COURT:  He was in your face?

11:05:10 25            THE WITNESS:  He said, "So when are you going to stop

11:05:13 1 calling police on black men?  Are you done with that?"

11:05:16 2          I said, "No, I'm going to follow this forward."

11:05:19 3 I kept a straight face, you know.

11:05:23 4          THE COURT:  Following, did somebody else do the same

11:05:30 5 thing?  Did somebody else confront you?

11:05:30 6          THE WITNESS:  Not confront me in a physical manner, but

11:05:32 7 I did have -- I have no idea who this guy is.  I was at my own

11:05:40 8 house, and I'm not going to say where my aunt lives, but it was

11:05:46 9 in Louisiana, and a guy knocked on the door, never been to our

11:05:51 10 house before, looking to buy sex from me.  She told him a few

11:05:57 11 words and said that the next time he comes back, she's going to

11:06:01 12 call the police.  My aunt will testify to that.

11:06:09 13          They are believing every single word that they

11:06:13 14 hear on YouTube.  I'm not going to say that they are

11:06:16 15 intellectually deficient.  I'm going to say that I think they

11:06:20 16 are.  Every single word that they hear on YouTube, they are

11:06:24 17 believing.  Because I'm not saying anything.

11:06:25 18          If I defend myself, the police say that I'm

11:06:28 19 getting involved, which is what I tried to do initially before

11:06:31 20 even going to the police.  I tried to settle it on YouTube and

11:06:35 21 clarify everything.  They took and twisted everything that I

11:06:38 22 said, and I decided to just stay off of the panels, and I am

11:06:40 23 not to going to say anything.  I am going to go to the police.

11:06:43 24 They attacked me more for going to the police and now I am

11:06:46 25 here.

**OFFICIAL TRANSCRIPT**

If they are able to get away with that here, then I'm probably going to wind up dead, like I told the police. I'm either going to wind up dead, raped, or my nieces and nephews, because Minyango is threatening to rape children as well, and I have that that on video.

Minyango stalked somebody's 11-year-old son, calling him calling him "gay niggers" and all kinds of other stuff on YouTube and on Instagram, a 11-year-old child, putting his picture up on the panel and telling his address and telling others to go do the same of their group.

So, why would I allow that to happen to me without trying to do everything? I am clawing at everybody's door, and this court is my last hope to get an injunction against these people and at least (speaking simultaneously) --

THE COURT: You do understand that he has not been served.

THE WITNESS: He has not what?

MR. VARRECCHIO: Minyango has not been served yet. That came back as undeliverable.

Your Honor, I just want to mention one other thing.

EXAMINATION BY MR. VARRECCHIO:

Q. This Minyango Tokpah defendant, is it your understanding he works for some type of collection industry or financial industry or law firm that allows him access --

| | |
|---|---|
| 11:08:05 1 | A.    To skip tracing. |
| 11:08:07 2 | Q.    -- to addresses, to skip tracing, and things like that, |
| 11:08:12 3 | and he has bragged about this.  Has he mentioned this online? |
| 11:08:17 4 | A.    Yes. |
| 11:08:17 5 | THE COURT:  But he's not before me today. |
| 11:08:19 6 | MR. VARRECCHIO:  I know he's not before you, but |
| 11:08:20 7 | because they are interconnected, he has this information where |
| 11:08:23 8 | he can find relatives and addresses and locations, and it gives |
| 11:08:29 9 | her sincere belief that this isn't just somebody putting a |
| 11:08:33 10 | message on YouTube.  These people have posted film of stalking |
| 11:08:38 11 | other people.  He's bragging that he's in the position to find |
| 11:08:42 12 | people, through his business, and the people who have been |
| 11:08:46 13 | served are interconnected with him. |
| 11:08:50 14 | THE WITNESS:  They are in with the Good Guys and the |
| 11:08:53 15 | AFW -- an injunction against the Good Guys and the AFW would |
| 11:08:58 16 | cover all of that.  If he knows that he has been served, he |
| 11:09:02 17 | knows that because Theresa Brunson has been served. |
| 11:09:06 18 | THE COURT:  I understand but that's not -- we require |
| 11:09:10 19 | more than him saying, "I've been served online." |
| 11:09:15 20 | THE WITNESS:  That's their defense strategy.  Their |
| 11:09:19 21 | defense is not answering. |
| 11:09:20 22 | EXAMINATION BY MR. VARRECCHIO: |
| 11:09:21 23 | Q.    I'm going to ask you this question:  The fact of the last |
| 11:09:24 24 | year or two with the George Floyd situation, the |
| 11:09:28 25 | Black Lives Matter situation, and the sensitivity of police |

*OFFICIAL TRANSCRIPT*

11:09:31 1  interactions with black people, do you think any of that has

11:09:35 2  bled into the disputes and the threats made against you by the

11:09:38 3  defendants insofar as you're a black woman who made police

11:09:43 4  complaints to -- about black defendants?  Do you think that has

11:09:47 5  any interconnection that heightened your feeling of being

11:09:51 6  threatened?

11:09:51 7  A.    It did.  It does heighten my -- it does.  I mean, as I

11:09:59 8  told you, they are now calling me a *white woman.*  You know what

11:10:03 9  I mean.  Yes, I'm heightened.  I have an X on my head.  I'm

11:10:08 10  going to end up dead.  I'm going to end up dead.  I'm either

11:10:15 11  going to end up dead or raped.

11:10:17 12       With Andrea Stewart going around lying and saying

11:10:21 13  that I'm showing pictures of black mens' anuses online, that's

11:10:26 14  just a -- that is a lie.  Now, the people who did do that,

11:10:31 15  she's friends with.  She's blaming me for doing that.

11:10:33 16  Q.    What I want to do is separate the vulgar, as upsetting it

11:10:41 17  might be, from the real threats and the interconnectivity of

11:10:44 18  some of those defendants that have been served to the ones that

11:10:46 19  haven't.

11:10:47 20       Do you -- you provided some film and some screen

11:10:53 21  grabs to the Court in your earlier filings of Minyango Tokpah

11:10:58 22  stalking somebody; am I correct?

11:10:59 23  A.    Yes.  Yes.

11:11:00 24  Q.    And you provided some allegations that you believe that

11:11:08 25  because he's done this to other people, he would do this to you

11:11:10 1 and that the people aligned with him would do this to you?

11:11:14 2 A.   Yes.

11:11:14 3 Q.   Okay.  Do you believe that the three people who we did

11:11:21 4 serve -- you got Ms. Stewart, you got Jonte Miller, and you

11:11:29 5 have Theresa Brunson -- do you believe that they have advanced

11:11:31 6 the excitement against you to the point where other people will

11:11:37 7 act to exact vengeance of threats to you or injure you?

11:11:42 8 A.   Definitely Tanisha Wright.  Definitely Theresa Brunson

11:11:46 9 because she made him feel secure as an attorney that they could

11:11:50 10 do these things and that I should not be able and I should not

11:11:54 11 do anything about it, and definitely Jonte; he instigates and

11:11:58 12 he perpetuates and keeps it going.

11:12:01 13 Q.   How many people know that -- do you live in Louisiana now

11:12:04 14 full time?

11:12:05 15 A.   I did not tell anybody that.

11:12:07 16 Q.   Okay.  You did not tell anybody?

11:12:09 17 A.   They know that now.

11:12:11 18 Q.   Sitting here in court today, you tend to live here the

11:12:15 19 majority of the time?

11:12:16 20 A.   No.  I'm running from these people.

11:12:18 21 Q.   You don't want to say that?

11:12:21 22       THE COURT:  Do you have a domicile, ma'am?  Do you have

11:12:23 23 a home?

11:12:23 24       THE WITNESS:  Yes.

11:12:25 25       THE COURT:  Where is it?

*OFFICIAL TRANSCRIPT*

11:12:26 1          THE WITNESS:  My home is in Louisiana.

11:12:28 2          THE COURT:  Is it is in Acadiana Parish?

11:12:31 3          THE WITNESS:  It's in Louisiana, yes.  Yes.

11:12:35 4              Can I tell you offline where it is?

11:12:37 5          THE COURT:  I can't get a parish?  Because I don't know

11:12:41 6  if I have jurisdiction over any sort of injunctive proceeding.

11:12:46 7  I think I may have to transfer this to Western District.

11:12:49 8          MR. VARRECCHIO:  No, I don't believe you need to

11:12:51 9  because the damages were suffered here while she was in the

11:12:53 10 Eastern District.

11:12:54 11         THE WITNESS:  In New Orleans.

11:12:55 12         THE COURT:  But you're asking for me to enjoin people

11:12:58 13 while she does not reside in the Eastern District.

11:13:01 14         MR. VARRECCHIO:  But at the time --

11:13:01 15 EXAMINATION BY MR. VARRECCHIO:

11:13:04 16 Q.   How long ago did you relocate to Louisiana?

11:13:07 17 A.   A week ago.

11:13:10 18 Q.   Okay.  Before you did that, were you in Louisiana when you

11:13:16 19 witnessed online any of the incidents or threats against you?

11:13:16 20 A.   I still have my home in New Orleans that I live at.

11:13:19 21 Q.   Okay.  Where were you when you experienced the threats?

11:13:23 22 A.   In New Orleans on Saint Charles Avenue.  That's the

11:13:26 23 address they stalked me at, I mean, where they a doxxed me at

11:13:31 24 and in Delaware.

11:13:33 25         MR. VARRECCHIO:  Your Honor, she was domiciled --

11:13:35  1        THE COURT:  Let me make myself clear.  I am absolutely

11:13:39  2   lost because what I hear is there is a podcast in which people

11:13:45  3   say inciteful things and what I would call have *inappropriate,*

11:13:52  4   *incendiary comments* about this plaintiff.  That's what I hear.

11:13:57  5        But I have not heard that they have visited her

11:14:04  6   home or sent anyone to her home.  There was an event where

11:14:10  7   someone got in her face and said ugly things.  That's why I'm a

11:14:15  8   little bit at a loss because now I'm hearing they were in

11:14:18  9   New Orleans.  They were physically present here, and so I'm --

11:14:18 10        MR. VARRECCHIO:  No, no, no, Your Honor.

11:14:25 11        THE WITNESS:  I didn't say that.

11:14:25 12        MR. VARRECCHIO:  I know where this is headed.  Can I

11:14:30 13   give you a shorthand --

11:14:31 14        THE COURT:  Well, I need evidence.

11:14:32 15        MR. VARRECCHIO:  Okay.  I will get it elicited from the

11:14:35 16   plaintiff.

11:14:35 17        She was domiciled in Delaware when these

11:14:38 18   controversies started.  Over a long period of time, she was

11:14:42 19   threatened and she was defamed and she was incited against.

11:14:46 20   You've got all these people out in the inter land.  She doesn't

11:14:51 21   know the one, the weak one who was going to act.  She didn't

11:14:56 22   see them come to her house.

11:14:57 23        While she's in Louisiana over the last year, and

11:15:00 24   we've attested to this in the petition and in the filings, she

11:15:03 25   was physically in the Eastern District when she witnessed

11:15:09 1    online the threats against her that motivated her to come to

11:15:15 2    me.  That is why we filed here.

11:15:18 3            She has since relocated her domicile from

11:15:22 4    Pennsylvania -- I mean, from Delaware to Acadiana, but she

11:15:29 5    witnessed and experienced the threats on multiple occasions

11:15:31 6    over many, many months while she was at her nondomicile

11:15:37 7    residence here.

11:15:38 8            My argument is or my position is she does not

11:15:42 9    need to be domiciled in the Eastern District to win the case in

11:15:48 10   the Eastern District because the damages and the threats were

11:15:50 11   made against her while she was here.  The tort occurred here.

11:15:56 12   This is a state law tort because the federal government does

11:16:00 13   not allow a civil claim for violation of stalking, so we had to

11:16:05 14   bring it here under diversity.

11:16:10 15           All of the defendants are nonDelaware and

11:16:12 16   nonLouisiana.  So we have complete diversity of the defendants.

11:16:17 17   We've got an original Delaware domicile, who is now a Louisiana

11:16:22 18   domicile, who experienced the tort in the Eastern District

11:16:25 19   bringing the case in the Eastern District.  I believe that

11:16:29 20   gives you jurisdiction.

11:16:31 21        THE COURT:  My question, though, is:  You're asking me

11:16:43 22   to enjoin speech.

11:16:47 23        MR. VARRECCHIO:  I am and here is why:  Because you've

11:16:51 24   got this very hostile group of people spread out across the

11:16:56 25   country with a very high temperature of threats to my client,

with the added heightened temperature of the George Floyd racial element of people betraying black men and people making law enforcement against black men.  You've got that dynamic.

Then you've got the fact that these same actors who are interconnected, some were served and some not, have displayed the -- on film, I am going to do this to you or I want to see this done to you, I have thousands of followers every day on my YouTube channel, and I've got film of me stalking other people.

I've got written proof of harassment of an 11-year-old boy, and I am going to go after this boy.  I have other proof that we've sent and filed with the Court.

We've got testimony and affidavit that I want to see bad things happen to you.  I want to see Catherine Brown raped.  I want to see Catherine Brown made to suffer from making complaints against black men that are false.  I want to see all these bad things happen to her.

That crosses the line from calling somebody *fat* or calling somebody a *political disagreement*.  You are now inciting, using a public airway -- Google, YouTube -- to get other people to -- you're threatening her and having these other people as your tools.

The potential of this being acted out on is what we're seeking to stop here.  We cannot wait for the rapist to get at her door.  We cannot wait for the car to run her over at

11:18:45 1    the crosswalk.  We're trying to stop these people from pumping

11:18:50 2    this poison into the air, through the Internet, through the

11:18:54 3    YouTube channel.  We have proof that we filed that YouTube and

11:18:59 4    Google has taken down some of these same people.

11:19:03 5         THE COURT:  That's what I know I'm not familiar.  I

11:19:06 6    have never done it.  I know people get in Facebook jail when

11:19:11 7    they are taken down because the comments made are incendiary

11:19:17 8    and inflammatory.  Has a request been made to YouTube to take

11:19:24 9    down --

11:19:24 10        MR. VARRECCHIO:  Yes.

11:19:24 11        THE COURT:  And have they --

11:19:24 12        MR. VARRECCHIO: (Speaking simultaneously) They have

11:19:25 13   done in the past.  The problem we have is it's the same actors,

11:19:27 14   the same human beings, people, are not enjoined from coming up

11:19:31 15   with a new channel and doing the same thing.  Then they email

11:19:36 16   their followers, I'm on TCTV 4 instead of TCTV 1.

11:19:42 17            What my goal is, I have a pretty modest goal,

11:19:46 18   Your Honor, and I don't think it's unreasonable.  My goal is to

11:19:49 19   enjoin the people we serve from continuing to threaten her.

11:19:52 20            My second thing is, is to send out subpoenas

11:19:59 21   through this open litigation to YouTube to get the names of the

11:20:03 22   actors behind the aliases -- the TCTV, the Good Guys, the

11:20:08 23   activists.  Some we know their names, some we don't, or they

11:20:13 24   might all be the same people.

11:20:14 25            Eventually get a court order saying these people

**OFFICIAL TRANSCRIPT**

who have been proved to have threatened Catherine Brown cannot post threats or mentions of Catherine Brown evermore, whether they be blind items or whether they be by name. We can try to get there. I want to give this lady some peace.

THE COURT: Oh, I understand. I guess, part of me, I'm looking at the pleadings, and there are a variety of names identified. Even if I can, and I'm not certain I can, even if I could issue this preliminary injunction, what's to stop the primary actor from continuing?

It seems to me that what you're asking me to do is take three people, enjoin these three people that have been served, who have defaulted and say, you may not say or incite violence, you cannot incite violence against this person. If I can. If I can. So that's a big deal. Even if I could, what's to stop that primary actor, and his name escapes me now --

MR. VARRECCHIO: Mr. Tokpah.

THE COURT: He's going to get right back online, and say, Listen, now --

MR. VARRECCHIO: I'm going to tell you -- I'm going to let Catherine tell you.

THE COURT: No, this is the question I'm asking you.

MR. VARRECCHIO: Okay. I'm going to tell you why, because they have ridiculed this litigation. They've ridiculed the idea of coming to court. They don't think that we are serious. They don't think you are serious. They've ridiculed

11:22:00 1    the idea of a judge telling them what to do.

11:22:04 2        THE COURT:  That's not an uncommon process across the

11:22:08 3    United States.

11:22:08 4        MR. VARRECCHIO:  I understand that.  I understand that.

11:22:11 5    But I believe that an order giving at least partial relief to

11:22:19 6    Ms. Brown will give us -- put us in a position to let them know

11:22:22 7    that we're pursuing it, Number 1.

11:22:25 8              Number 2, it will allow us to get subpoenas to

11:22:29 9    Google so we can come back here with a bigger -- with

11:22:32 10   identities and a service of process on a bunch of people to try

11:22:37 11   to stop this.

11:22:38 12       THE COURT:  This is open litigation.  You can issue

11:22:40 13   subpoenas right now.

11:22:41 14       MR. VARRECCHIO:  We're going to do that.  We're going

11:22:42 15   to do that, but right now I was focused on trying to serve as

11:22:46 16   many as I can now, and try to -- they are online on YouTube on

11:22:50 17   their channel saying it isn't even a real lawsuit.  It's a

11:22:55 18   joke.  It's a joke.  All of this is a joke.

11:22:57 19       THE COURT:  That's fine.  You can read the newspaper on

11:23:02 20   any given day and have a comment from somebody saying this is

11:23:05 21   an absurd lawsuit; it's an absurd indictment.  That's all part

11:23:13 22   of free speech.  You say those things.

11:23:15 23       MR. VARRECCHIO:  No, no, no.

11:23:17 24       THE COURT:  But -- but, I guess, if, indeed, this has

11:23:23 25   happened, I mean, if, indeed, there is a mechanism for me to

11:23:29 1   enjoin this speech, is this the way to do it, piecemeal, or

11:23:35 2   should we wait until people have been properly served?

11:23:39 3   They are all defaulted if they choose not to

11:23:42 4   respond.  Then they are all in default, and that person that

11:23:45 5   has said those actual things -- because what I'm hearing is the

11:23:49 6   people that have said this are not before me today.  Some have

11:23:56 7   said ugly things, but she reports black men to the police,

11:24:01 8   that's not in and of itself a threat.

11:24:03 9   What is a threat is, I am going to rape her, and,

11:24:11 10  oh, by the way, this is her home if you want to help me Friday

11:24:16 11  night at six o'clock.  That's what I'm concerned about.

11:24:19 12  It seems like what we need is this -- anyway,

11:24:25 13  maybe you can respond.

11:24:26 14      MR. VARRECCHIO:  Your Honor, you have the client

11:24:29 15  telling you that she's experienced these things.

11:24:32 16      THE COURT:  Sure.

11:24:32 17      MR. VARRECCHIO:  When you separate the vulgar and the

11:24:35 18  unpleasant from the real threats, there are real threats that

11:24:39 19  this lady has endured, and real concern, and there is evidence

11:24:46 20  that we presented to the Court that these people have

11:24:49 21  threatened her and have threatened other people, and they have

11:24:52 22  proclivities to do this.

11:24:54 23  Any judgment, no matter how piecemeal, is going

11:24:59 24  to give some peace to us and will demonstrate to the larger

11:25:03 25  universe of these intertwined people that there is going to be

**OFFICIAL TRANSCRIPT**

| | |
|---|---|
| 11:25:08 1 | a reckoning, and there is at least going to be somebody trying |
| 11:25:11 2 | to stop this. |
| 11:25:12 3 | That's what it is. I'm less involved. I've sued |
| 11:25:15 4 | for damages but my Number 1 concern and my Number 99 concern is |
| 11:25:23 5 | to give her some peace and not sue these people for the damages |
| 11:25:28 6 | that we are going to pursue at some point. |
| 11:25:32 7 | THE WITNESS: I'm not understanding where Tanisha at |
| 11:25:34 8 | one point saying that she's going to pull up on me, meaning do |
| 11:25:34 9 | a drive-by shooting of me, and she's going to can kick my ass, |
| 11:25:38 10 | and I live in Delaware in the same place that she lives and |
| 11:25:42 11 | telling this on -- to thousands of people, I'm not |
| 11:25:46 12 | understanding how that's not -- because I went to the cops and |
| 11:25:49 13 | because I filed a lawsuit, I'm not understanding where there is |
| 11:25:51 14 | no threat there. |
| 11:25:53 15 | THE COURT: Okay. |
| 11:25:56 16 | THE WITNESS: And she's been served. |
| 11:25:58 17 | THE COURT: You sued for defamation and intentional |
| 11:26:02 18 | infliction of emotional distress, correct? |
| 11:26:05 19 | MR. VARRECCHIO: Yes. And that's, in part, for the |
| 11:26:09 20 | actual violation of the federal criminal law, too. That's part |
| 11:26:15 21 | of it also. |
| 11:26:16 22 | THE COURT: If I say there is potential for me to issue |
| 11:26:19 23 | a preliminary injunction, I have to say there is potential for |
| 11:26:25 24 | likelihood of success on the merits. |
| 11:26:27 25 | MR. VARRECCHIO: I absolutely believe that. |

*OFFICIAL TRANSCRIPT*

11:26:29 1          THE COURT:  I understand but what's the basis of the

11:26:32 2     tort if it's defamation or --

11:26:35 3          MR. VARRECCHIO:  They've threatened her peace.  They've

11:26:38 4     threatened her body.  They've intentionally --

11:26:40 5          THE COURT:  Which tort did that?

11:26:43 6          MR. VARRECCHIO:  Which court?

11:26:45 7          THE COURT:  Tort, T-O-R-T.

11:26:46 8          MR. VARRECCHIO:  Intentional infliction of emotional

11:26:49 9     distress, 2315.

11:26:50 10          THE COURT:  Okay.  So it's intentional infliction of

11:26:53 11     emotional distress.

11:27:02 12          MR. VARRECCHIO:  Yes.

11:26:54 13          THE COURT:  Then I would issue a preliminary injunction

11:26:58 14     stopping them from inflicting emotional distress?

11:27:02 15          MR. VARRECCHIO:  Yes.  I'll tell you another way we can

11:27:05 16     go about this.  You can --

11:27:05 17          THE COURT:  I mean, it's legally -- I'm just really

11:27:10 18     struggling with the legal process.

11:27:13 19          MR. VARRECCHIO:  It's 2315 allows that.  It's the

11:27:15 20     intentional violation of the criminal law.  It's intentional

11:27:21 21     infliction of emotional distress Louisiana tort law that they

11:27:26 22     are inflicting emotional distress on her intentionally.  They

11:27:29 23     are threatening her peace.  They are threatening her peace of

11:27:32 24     mind.

11:27:33 25          THE COURT:  So if I made a finding here that there is a

*OFFICIAL TRANSCRIPT*

potential for likelihood of success on the merits of a claim of intentional infliction of emotional distress are you telling me that I can issue a preliminary injunction enjoining them under that tort?

MR. VARRECCHIO: Yes, yes. Further, you can base that judgment on the fact that YouTube and Google have, in many instances, taken down channels.

THE COURT: I know. I think that's the real answer. It's just saying --

MR. VARRECCHIO: Well, I think the fact that this is a big enough group of people that are intertwined and that you -- you've not only got a plaintiff that's in distress, in legitimate distress, and that she needs some type of relief, and these particular people have been identified and have been -- I'm trying to pull up my petition with my allegations in tort that I might be able to help guide the Court with some of this.

THE COURT: I think what I'm going to need, Mr. Varrecchio, to be honest, is a significant post hearing briefing on specifically this question because, you know, there is the four elements for a preliminary injunction, and then, I guess, I've never issued -- preliminary injunctions are a pretty extraordinary remedy, and I would need to understand under which tort am I operating when I say there is a likelihood of success on the merits.

11:29:31 1          Is there a case where a judge has issued an

11:29:35 2    injunction under the tort of intention -- based on the tort of

11:29:43 3    intentional infliction of emotional distress?  Because we

11:29:47 4    looked at this, and we can't find anything.

11:29:59 5          MR. VARRECCHIO:  I'll go ahead and try to find some

11:30:04 6    case law to base this on.

11:30:06 7          THE COURT:  I can't believe this is the only time

11:30:08 8    someone has come to the court and said, I'm being harassed and

11:30:14 9    I've suit in civil law for intentional infliction of emotional

11:30:18 10   distress, if that's what you're going with, and I'm asking you

11:30:22 11   and you said yes.

11:30:23 12         MR. VARRECCHIO:  Well, that's certainly a piece.  It's

11:30:25 13   certainly a piece.  It's not exclusive.

11:30:27 14         THE COURT:  Then in defamation -- so I will tell you,

11:30:40 15   we have talked about this and have had a great deal of

11:30:45 16   difficulty in compartmentalizing this in a way that's been

11:30:50 17   applied under the law, so I need some extensive briefing to

11:30:53 18   tell me that.

11:30:54 19         Then I need you to tell me how I can fashion that

11:31:02 20   as to Ms. Wright and Mr. Miller.  I'm putting Ms. Stewart to

11:31:09 21   the side.  I've got a request from her *pro se*.  "I am getting a

11:31:15 22   lawyer.  Please give me time."  And Ms. Brunson saying -- I

11:31:20 23   have not heard to date that tells me Ms. Brunson has threatened

11:31:26 24   other than to say, Please don't file these police reports, and

11:31:29 25   there was a cease-and-desist letter.  I don't think that's a

threat. Threatening litigation is not something that one issues an injunction on.

MR. VARRECCHIO: What I'm going to do is we're going to leave here today. I'm assuming where this is headed. We're going to leave here today without a court order.

THE COURT: You will leave here today without a court order. A preliminary injunction is an extraordinary remedy that has to be based entirely on the law with supporting --

MR. VARRECCCHIO: What you're asking me to do is --

THE COURT: File briefing.

MR. VARRECCHIO: You're going to forebear and delay ruling on it until I come back with some briefing.

What I'm going to do is I'm going to come back on intentional infliction law and see if we can base a preliminary on that.

I'm also going to explore the entire nation litigation report cases to see if there is a civil context for a cyberstalking preliminary injunction that you stop harassing someone.

I'm also going to go to state court and look for something, because we also have state cyberstalking, and I'll come back -- we're going to come become here.

THE COURT: You just need to write it.

MR. VARRECCHIO: Yeah, write the brief. We don't need to physically come back. I'm going to file, in a couple of

*OFFICIAL TRANSCRIPT*

11:32:49 1  weeks, if you can please give me that.

11:32:50 2          THE COURT:  I will give you a couple of weeks because I

11:32:53 3  think this is going to be quite a process.

11:32:56 4          MR. VARRECCHIO:  It is.  My entire week is in eight

11:33:00 5  depositions, which ended at 9:00 p.m. last night, and I got six

11:33:05 6  more depositions in the next three days.

11:33:07 7          THE COURT:  Mr. Varrecchio, we're all in a mess at this

11:33:11 8  time.

11:33:11 9          MR. VARRECCHIO:  We're all in a mess.  Can you give me

11:33:13 10 21 days, please?

11:33:13 11         THE COURT:  I can give you 21 days, but I need to have

11:33:18 12 some significant briefing.

11:33:20 13         MR. VARRECCHIO:  Something to hang your hat on.  That's

11:33:25 14 my job and I plan to meet that task.

11:33:27 15         THE COURT:  Okay.

11:27:02 16         MR. VARRECCHIO:  So we're going to forebear where we

11:33:30 17 are right now for the next 21 days.

11:33:32 18         THE COURT:  Yeah.  You're asking me to enjoin speech.

11:33:39 19         MR. VARRECCHIO:  Can I also -- if I need to, can I have

11:33:43 20 leave to amend my petition if I need to include something else

11:33:49 21 in it?

11:33:50 22         THE COURT:  Nobody has filed an answer.  You can amend

11:27:02 23 your petition at any time.

11:27:02 24         MR. VARRECCHIO:  If I have to add something, I will.

11:33:51 25         THE COURT:  You don't need to request leave of court.

**OFFICIAL TRANSCRIPT**

11:33:54 1    There has been no answer filed.

11:33:55 2                MR. VARRECCHIO:  Correct.

11:33:56 3                Okay.  Again, to let you know, Ms. Brunson did

11:33:59 4    contact me, but, yeah, I don't know where that's going.

11:34:02 5                THE COURT:  Thank you.

11:34:03 6                MR. VARRECCHIO:  What I'm doing, I'll let the people

11:34:06 7    who contacted me know that I'm not going to ask to default them

11:34:09 8    in the next 30 days.

11:34:11 9                THE COURT:  But they should be asking the Court.

11:34:14 10               MR. VARRECCHIO:  Yeah.  I instructed every contact I've

11:34:17 11   had, I've responded that way.

11:34:20 12               THE COURT:  Okay.  Thank you.

11:34:20 13               MR. VARRECCHIO:  Thank you, Your Honor.

11:34:22 14               THE COURT:  Court is adjourned.

11:34:24 15               THE DEPUTY CLERK:  All rise.

16                (WHEREUPON, at 11:34 a.m., the proceedings were

17    concluded.)

18                              *   *   *

19                        REPORTER'S CERTIFICATE

20         I, Cathy Pepper, Certified Realtime Reporter, Registered
      Merit Reporter, Certified Court Reporter in and for the State
21    of Louisiana, Official Court Reporter for the United States
      District Court, Eastern District of Louisiana, do hereby
22    certify that the foregoing is a true and correct transcript to
      the best of my ability and understanding from the record of the
23    proceedings in the above-entitled and numbered matter.

24                        *s/Cathy Pepper*
                          Cathy Pepper, CRR, RMR, CCR
25                        Official Court Reporter
                          United States District Court

                        ***OFFICIAL TRANSCRIPT***